## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JONATHON R. WYATT,                                    Case No. 1:12-cv-289

          Plaintiff,                                  Beckwith, J.
                                                      Bowman, M.J.
     v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

### REPORT AND RECOMMENDATION

Plaintiff Jonathon Wyatt filed this Social Security appeal in order to challenge the Defendant's findings that he is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents two claims of error, both of which the Defendant disputes.  For the reasons explained below, I conclude that this case should be REMANDED because the finding of non-disability is not supported by substantial evidence in the administrative record.

### I.  Summary of Administrative Record

On September 11, 2007, Plaintiff Jonathon R. Wyatt protectively filed an application for SSI, alleging disability as of July 2, 2007.  (Tr. 112-14).[1]  After Plaintiff's claims were denied initially and upon reconsideration, he requested a hearing *de novo* before an Administrative Law Judge ("ALJ").  An evidentiary hearing, at which Plaintiff was represented by counsel, was held on December 11, 2009.  (Tr. 34-66).  An impartial medical expert, Mark I. Oberlander, Ph.D., and a vocational expert, Mark A.

---

[1] Plaintiff also filed an application for SSI on August 2, 2006 (Tr. 109-11). The application was denied at the initial stage (Tr. 71-73).  There is no indication from the record that Plaintiff requested reconsideration of the initial decision.

Pinti, were also present and testified.  On May 28, 2010, ALJ Amelia Lombardo denied Plaintiff's application in a written decision.  (Tr. 10-26).

The record on which the ALJ's decision was based reflects that Plaintiff was 27 years old at the time his application was filed and completed the eleventh grade. Plaintiff had no past relevant work.  (Tr. 24).

Based upon the record and testimony presented at the hearing, the ALJ found that Plaintiff had the following severe impairments: "a bipolar disorder, substance abuse and borderline intellectual functioning." (Tr. 12).  The ALJ concluded that none of Plaintiff's impairments alone or in combination met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subp. P, Appendix 1.  The ALJ determined that Plaintiff retains the following residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations:

> He is limited to simple repetitive tasks that are low stress in nature, defined as no assembly line production quotas, not fast-paced, no contact with the general public, and no more than minimal contact with coworkers and supervisors.

(Tr. 17).  Based upon the record as a whole including testimony from the vocational expert, and given Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy, including such jobs as industrial cleaner, warehouse worker, laundry folder and machine tender. (Tr. 25).  Accordingly, the ALJ determined that Plaintiff is not under disability, as defined in the Social Security Regulations, and is not entitled to SSI. *Id.*

The Appeals Council denied Plaintiff's request for review.  Therefore, the ALJ's decision stands as the Defendant's final determination.  On appeal to this Court, Plaintiff first argues that the ALJ erred by: 1) failing to find that Plaintiff's impairments met or equaled Listings 12.02, 12.04, 12.06, 12.08 and/or 12.09; and 2) evaluating and weighing the opinion evidence.  Upon close analysis, the undersigned finds that the ALJ improperly evaluated the evidence of record in determining that Plaintiff did not meet any of the Listings for mental impairments.

**II. Analysis**

**A.  Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence

3

supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he or she

suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him or her unable to perform any job in the national economy.   42 U.S.C. § 423(d)(1)(A).

### B. Relevant Evidence and ALJ Decision

Plaintiff's application is based primarily on his mental impairments.  The record indicates that Plaintiff was raised by his mother until she married when he was two and he was adopted by her husband.  When he was 12, his mother died and his adoptive father remarried when he was 14.   He lived with them until he was 15 when his stepmother had her grandson move in with them and he left and lived with friends when he could.  He reported that he was sexually abused by a cousin when he was 7 or 8.

Plaintiff was in special education classes beginning in the eighth grade and he dropped out of school in the eleventh grade.  He was hospitalized for depression and anger after his mother's death in 1994.   In about 1994 or 1995 he began receiving outpatient counseling at Wright Patterson AFB for help in dealing with anger and depression for approximately four weeks.

Plaintiff reported that he was shot in the left calf in 1997 and was stabbed in his right side in 1997.  He was hit by a truck in 2001.  He was diagnosed with bipolar disorder in 2001 and anxiety in September 2006. (Tr. 215)   Plaintiff sustained a neck and head injury after being thrown from a horse in 2006.  He restarted mental health counseling in March 2006. He was treated for drug and alcohol abuse for six weeks in August 2006.  (Tr. 216)  He had been jailed for obstruction of justice and for unpaid fines.

On August 14, 2006, Dr. Lester Dornon, Plaintiff's treating physician, completed two medical questionnaires at the request of the state agency.  (Tr. 209-214).  Dr. Dornon indicated he treated Plaintiff from October 17, 2005 through July 27, 2006.  (Tr. 213).  Dr. Dornon cited Plaintiff's diagnosis as Bipolar Affective Disorder.  With respect to Plaintiff's mental status examination, Dr. Dornon indicated: "Labile affect. Fluctuating mood. Impatient. Decreased sleep. energy level high. Always 'on edge.'"  (Tr. 220).  He further noted that Plaintiff displayed "pressed speech.  Grandiose, animated.  Poor frustration tolerance. Poor insight into problem." *Id.*  Dr. Dornon also found that Plaintiff's  ability to deal with stress was poor, he made poor choices, his behavior was "often inadequate" and he had "poor frustration tolerance" in social interactions.  *Id.* Plaintiff missed appointments and "[he had a] serious impairment in interpersonal skills and absenteeism, due to poor judgment and unwise choices.  Dr. Dornon also noted that lithium helped Plaintiff some.  (Tr. 214).   Dr. Dornon further indicated that Plaintiff "was never stabilized under my care," did not respond well to treatment and not compliant with medication and appointments.  (Tr. 210).

On November 16, 2006 Plaintiff was seen by Dr. George Schulz for a consultative evaluation.  (Tr. 212-22).  Plaintiff reported that he lived with his girlfriend and her daughter. Dr. Schulz noted that Plaintiff appeared to be fidgety, his mood was euthymic to anxious and his judgment was adequate.  On the WAIS-III test, he scored 66 on the Verbal IQ, 62 on the Performance IQ, and 62 on the Full Scale IQ, placing him in the extremely low range.  He scored in the low to lower extreme range on the WRAT-4.  Dr. Schulz diagnosed Bipolar Disorder NOS, Polysubstance Dependence, Borderline Personality Disorder, and Borderline Intellectual Functioning and was

6

assigned a Global Assessment of Functioning (GAF) of 50.[2] (Tr. 220).  Dr. Schulz determined that Plaintiff's ability to relate to others was moderately to severely impaired; his ability to understand, remember, and carry out instructions was moderately impaired; his ability to maintain concentration and attention was minimally impaired; and his ability to withstand the stress and pressure of work was moderately to severely impaired. (Tr. 221-22).  Dr. Schulz further indicated that Plaintiff's prognosis was poor. (Tr. 222).

The record also contains treatment notes from Mental Health and Recovery Center dated August 3, 2006 through June 19, 2007.  (Tr. 246-305).  Such notes indicate that Plaintiff underwent a Crisis Intervention Assessment Plain on August 3, 2006.  The diagnosis was Alcohol Dependence, Cannabis Dependence, and Bipolar by history. GAF was 60. (Tr. 299).  On the mental status exam, Plaintiff was described as disheveled, anxious, irritable, hyperactive, impulsive, restless, and loud.  His thought processes contained flight of ideas with racing thoughts.  (Tr. 294-95)  Notes from August 17, 2006, indicate that Plaintiff was disheveled, agitated, intense and anxious. His intelligence was borderline. His speech was rapid and his thought processes were loose.  He was very jittery.  (Tr. 291).  Thereafter, Plaintiff reported impulsive anger when stressed.  He also had problems with concentrating and getting tasks done.  His girlfriend described mood swings where he was grandiose or depressed.  (Tr. 292).

---

[2]  A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000).  The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning."  *Id.*  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). Id. at 34.  The DSM-IV categorizes individuals with a score of 50 as having "severe symptoms ... or serious impairment in social, occupational, or school functioning."  *Id.*

Plaintiff was observed to be high strung with little patience and mood swings.  He had depression and anxiety. His mood was depressed and his affect was impatient.  He was nervous.  His insight and judgment were questionable.  The diagnosis was Bipolar Disorder Type II, ADHD, and Alcohol Dependence.  Plaintiff was also assigned a GAF score of 45.  (Tr. 288).  During his sessions, treatment notes indicate that Plaintiff was observed with rapid speech; an intense, anxious, frustrated, flustered, or angry affect; and impulsive behavior with poor concentration; and to be upset, crying, stressed, worried and/or scared.  (Tr. 252-53, 256, 258-59, 263, 266-67, 269, 271-73, 275-76, 278-280, 282.)  On November 7, 2006, his mental health therapist noted: he "was not stable.  Poor judgment & decision making."  (Tr. 261).

Dr. Steve Sparks, a psychologist, evaluated Plaintiff on October 31, 2007 at the request of the State agency.  (Tr. 306-12).  Plaintiff reported that he had had twelve beers the night before the evaluation and had used marijuana two days prior to the evaluation. (Tr 307).  Clinical testing indicated deficits in his cognitive function as well as alcohol dependence and drug abuse for the past 12 months.  "[H]e demonstrated severe hyperactivity and excitement, moderately severe tension and distractibility, and moderate grandiosity and elated mood."  (Tr. 309).  Plaintiff was observed to have good hygiene and did not appear intoxicated. He "was extremely excitable during the evaluation."  (Tr. 310).  He had pressured speech and tangential and loose associations in his thought processes. He had some grandiosity. His attention and concentration were affected.  His adaptive functioning was lower due to his mood problems.  Plaintiff's insight and judgment were fair.  Dr. Sparks stated, "He appears marginally capable of living independently and to have adequate decision-making abilities." (Tr. 310).  Dr.

Sparks further noted that "despite his experience of drug abuse, he does appear to experience a free-standing bipolar disorder. From a psychological symptom-related standpoint, there appears to be some mild impairment in reality testing and GAF is rated between 31 and 40." (Tr. 310) .

From a functional standpoint, Dr. Stark noted that Mr. Wyatt appears to be experiencing serious difficulty due to psychological symptoms, and as such, his GAF is rated between 41 and 50.  Dr. Stark diagnosed Polysubstance Dependence, Bipolar Disorder NOS, and Borderline Intellectual Functioning.  *Id.*  Dr. Stark opined that Plaintiff's ability to relate to others was extremely impaired; his ability to understand, remember, and carry out instructions was moderately impaired; his ability to maintain attention to perform simple, repetitive tasks was extremely impaired; and his ability to deal with work stress and pressures was markedly impaired.

In November 2007, Plaintiff was admitted to Middletown Regional Hospital due to suicidal ideation.  (Tr. 315-28).  Treatment notes from Plaintiff's initial intake state:

> "[H]e appears manic.  He is unable to complete thoughts.  He is jumping from one place to another.  Actually, it looks like he is about to lose control completely.

(Tr. 321).

Upon mental status examination, Plaintiff was "disheveled," alert and his mood was elevated.  He was "hyperverbal" and "manic".  He was [d]ifficult to interpret and he had significant pressured speech and flight of idea" (Tr. 327).  On mental status exam, he was hyperactive, and agitated, had poor impulse control, had an expansive affect, was loud, had perseveration and tangential speech, had compulsive thought content, had impaired judgment and insight, and his mood was tearful, depressed, and angry.

(Tr. 323).   Plaintiff was diagnosed with Bipolar I disorder, most recent episode manic, and Cannabis abuse. GAF was 25.  Plaintiff was discharged on November 14, 2007.

The record also contains treatment records from Butler Behavioral Health Services, dated January 23, 2008 through February 25, 2008.  He was again diagnosed with Bipolar Disorder recent episode manic.  On the mental status exam, he had motor agitation and his affect was anxious. (Tr. 376).  During his treatment sessions, he was anxious and nervous and his thought processes was tangential.  (Tr. 374).

Records from Forensic and Mental Health Services, dated January 31, 2009 to April 21, 2009, were submitted.  On March 18, 2009, he was observed to be unkempt, his mood was depressed and anxious, his affect was labile, and he was restless, hyperactive, and withdrawn on mental status exam. His insight and judgment were poor. (Tr. 414).  On April 21, 2009, he was "[e]xtremely anxious—helpless and hopeless." (Tr. 407).  He was described as irritable, angry and hostile.  (Tr. 405).

The record also contains three assessments from state agency physicians. Notably, Dr. Goldsmith reviewed the record and completed a mental residual functional capacity assessment on November 28, 2006, wherein he opined that Plaintiff would have some limitation in the ability to interact with others, follow instructions and withstand work stress.  (Tr. 243).  Dr. Goldsmith further determined that Plaintiff would function best in an atmosphere where tasks are simple, routine, repetitive, and with infrequent change in responsibilities.  *Id.*  Reviewing psychologist Dr. Meyer completed a mental residual functional capacity assessment on November 21, 2007, wherein he determined that Plaintiff was capable of simple and some moderately complex and

routine work that can be performed at a reasonable pace. Dr. Waggoner reviewed Plaintiff's medical file and affirmed Dr. Meyer's assessment on April 2, 2008.

Additionally, at the administrative hearing, the ALJ heard testimony from Dr. Mark Oberlander, M.D., a medical expert. Notably, based his comprehensive review of the record, Dr. Oberlander opined that Plaintiff met one of the mental health listings. (Tr. 46). Dr. Oberlander further testified that Plaintiff had moderate limitations engaging in activities of daily living and marked limitations interacting socially and maintaining concentration, persistence or pace. (Tr. 42). Dr. Oberlander said he based his testimony, in part, on Dr. Sparks' report and Plaintiff's GAF score of 25.

In light of the foregoing, at step two in the sequential evaluation, the ALJ found Plaintiff's bipolar disorder, substance abuse and borderline intellectual functioning to be severe impairments. (Tr. 12). At step-three, the ALJ found that Plaintiff's impairments did not meet or equal any of the Listings for mental disorders. With respect to the paragraph "B" criteria, the ALJ determined that Plaintiff was only mildly restricted in activities of daily living and moderately limited in social functioning and in maintaining concentration, persistence or pace. (Tr. 14). In making this determination, the ALJ relied on the findings of the state agency medical consultants, Bruce Goldsmith, Ph.D., Steven Meyer, Ph.D. and Cynthia Waggoner, Psy.D.

In finding that Plaintiff did not meet any of the Listings related to mental impairments, the ALJ also gave little weight to the opinion of Dr. Oberlander, the medical expert who opined that Plaintiff met one of the mental health listings. (Tr. 46). The ALJ determined that Dr. Oberlander's opinion was not rationally based on the criteria of the Listings and was inconsistent with the totality of the substantial evidence

of record.  The ALJ further found that Dr. Oberlander did not "adequately understand the Listing of Impairments or how to differentiate between objective medical findings and claimant's reports of his symptoms." (Tr. 17).

As with his listing determination, in formulating Plaintiff's RFC, the ALJ gave significant weight to the opinions of Dr. Meyer and Dr. Waggoner, and some weight to the findings of Dr. Goldsmith "as their assessments are consistent with the substantial medical evidence…." (Tr. 23).  The ALJ gave little weight to the findings of Dr. Schulz because his IQ testing was inconsistent with prior IQ testing results in the record.  The ALJ also gave little weight to the findings of Dr. Sparks, "as he apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and seemed to uncritically accepted as true most, if not all, of what the claimant reported." (Tr. 23).  The ALJ determined that Plaintiff's "problems seem to be a lack of consistent compliance with treatment recommendations and lack of motivation" and therefore believed that the limitations in his RFC determination adequately accounted for Plaintiff's bipolar disorder and mental limitations.  The ALJ further noted that no treating source provided a contrary opinion that Plaintiff is disabled.  *Id.* In response to hypothetical questions based upon the ALJ's RFC assessment, the vocational expert testified that there were significant jobs in the national economy that Plaintiff could perform.

### C.  The ALJ's Decision is not Substantially Supported

Plaintiff asserts that the ALJ erred by failing to adopt the testimony of the medical expert who found that he met or equaled the requirements for Listings 12.02, 12.04, 12.06, 12.08 and/or 12.09. Plaintiff further asserts that the ALJ erred in rejecting the

opinions of Plaintiff's treating sources, as well as the evaluating psychologists.  Upon close inspection, the undersigned finds that the ALJ's evaluation of Plaintiff's mental impairments did not comport with agency regulation and controlling law.  Thus, as explained below, the undersigned finds that the ALJ's decision is not substantially supported.

### 1.  *Applicable Law and Regulations*

In evaluating the opinion evidence, "[t]he ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakley v. Commissioner of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir.2004). A finding by the ALJ that a treating physician's opinion is not consistent with the other substantial evidence in the case record "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *4 (emphasis added). "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408. These factors include the length, nature and extent of the treatment relationship and the frequency of examination.  20 C.F.R. § 404.1527(d)(2)(i)(ii); 416.927(d)(2)(i)(ii); *Wilson*, 378 F.3d at 544.  In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the

opinion. 20 C.F.R. §§ 404.1527(d) (3)-(6), 416.927(d)(3)-(6); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir.2004).

More weight is generally given to an opinion offered by a medical source who has examined the claimant over an opinion offered by a medical source who has not examined the claimant. 20 C.F.R. § 404.1527(d)(1). More weight is given to opinions supported by "relevant evidence" such as "medical signs and laboratory findings[.]" 20 C.F.R. § 404.1527(d)(3). Further, more weight is given to those medical opinions that are "more consistent ... with the record as a whole[.]" 20 C.F.R. § 404.1527(d)(3).

Furthermore, when a claimant claims disability from a mental impairment, an ALJ must rate the degree of functional limitation resulting from that impairment with respect to "four broad functional areas," including: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(b)(2),(c)(3).  These four areas are commonly referred to as the "B criteria." *See Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir.2009) (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 et seq.). In order to meet the paragraph "B criteria" a claimant must be markedly limited in two of the four categories.

2.    *Paragraph "B criteria"*

As noted above, in this case, the ALJ rated Plaintiff's functional impairment in each of the four "B criteria" areas before concluding that Plaintiff did not meet or equal Listings 12.02, 12.04, 12.06, 12.08 and/or 12.09.   The ALJ determined that the paragraph B criteria was not met because he believed that Plaintiff was only mildly restricted in activities of daily living; moderately restricted in social functioning; and moderately limited in maintaining concentration, persistence or pace.   Plaintiff argues

14

that in making this determination, the ALJ erroneously relied on the opinions of the non-examining state agency psychologists and improperly rejected the opinion of Dr. Oberlander, the medical expert who testified at the administrative hearing that Plaintiff's impairments met or equaled one of the Listings for mental impairments. As more fully explained below, the undersigned finds that the ALJ's evaluation the paragraph B criteria is not substantially supported.

With respect to the paragraph B criteria, Dr. Oberlander opined that Plaintiff's personality disorder resulted in marked impairments of his social functioning and concentration, attention and persistence. (Tr. 42). When asked by the ALJ to provide an evidentiary basis for his conclusions relating to Plaintiff's social functioning, Dr. Oberlander testified that his opinion was based, in large part, on Dr. Starks report and Plaintiff's statements therein.[3] (Tr. 43). Dr. Oberlander further testified that his opinion was also based upon "presenting the symptomology" when Plaintiff was hospitalized for suicidal ideation. (Tr. 45).

The ALJ rejected Dr. Oberlander's testimony because it was wholly inconsistent with the record evidence. Notably, the ALJ found that Dr. Oberlander's determination that plaintiff had marked limitations in social functioning was based solely on Plaintiff's subjective complaints and was inconsistent with Plaintiff's reported daily activities. In this regard, the ALJ noted that Plaintiff stated that he was "generally comfortable being around people and got along with people in his community" (Tr. 16). Plaintiff also

---

[3] As noted above, upon examination, Dr. Stark opined that Plaintiff's ability to relate to others was extremely impaired; his ability to understand, remember, and carry out instructions was moderately impaired; his ability to maintain attention to perform simple, repetitive tasks was extremely impaired; and his ability to deal with work stress and pressures was markedly impaired.

15

reported that he performed and sang with his band on a weekly basis, went shopping in stores and went to the bowling alley.  (Tr. 139-40).  In addition to Plaintiff's activities, the ALJ noted that Plaintiff lived with his girlfriend for the past two years, walked through town to acquire drugs and "see everybody," did not consistently take psychiatric medication and had not sought recent mental health treatment.  (Tr. 16).  The ALJ also noted that Dr. Oberlander placed great weight on only some but not all of Plaintiff's GAF scores.

The ALJ's analysis, however, does not comport with controlling regulations and controlling law.  First, contrary to the ALJ findings, the fact that Dr. Starks opinions were based on Plaintiff's self-reports does not provide an adequate basis to reject such findings.  Notably, the Sixth Circuit Court of Appeals, citing *Poulin v. Bowen*, 817 F.2d 865 (D.C.Cir.1987), stated that:

> A psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment ... consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine.... In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices [sic] in order to obtain objective clinical manifestations of medical illness.... When mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121, (6th Cir.1989).

In *Blankenship*, the Sixth Circuit concluded that no cause existed to question the diagnosis of a psychiatrist made after only one interview and where no psychological testing had been conducted and even though the doctor noted the need for a more

accurate history. *Blankenship*, 874 F.2d at 1121. Thus, interviews are clearly an acceptable diagnostic technique in the area of mental impairments and Dr. Starks could rely upon the subjective complaints elicited during his evaluation of Plaintiff in formulating Plaintiff's functional restrictions. *See Warford v. Astrue*, No. 09–52, WL 3190756, at *6 (E.D.Ky. Aug. 11, 2010) (finding interviews are an acceptable diagnostic technique in the area of mental impairments). As such, to the extent the ALJ rejected the opinion evidence, including Dr. Oberlander's testimony (based on the Dr. Starks evaluation), because the evaluators relied upon Plaintiff's subjective complaints, such a finding is not substantially supported.

Second, in determining that Plaintiff was only moderately limited in social functioning, the undersigned finds that the ALJ improperly mischaracterized Plaintiff's statements and testimony relating to his daily activities. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (finding that ALJ's mischaracterized testimony regarding daily activities in violation of SSR 96-7p). Notably, the ALJ's decision states in relevant part:

> Dr. Oberlander arrived at marked limitation in social functioning because the claimant stated he cannot hold a job and has difficulty getting along with others. Yet, . . . the claimant stated that he has lived with his current girlfriend for the previous two years, that he plays in a band, and he knows many people in his area and the he acquires drugs by walking through town and "seeing everybody," and that he is generally comfortable being around people and gets along with people in his community.

(Tr. 16, citing (Tr.

Upon review of the record, it appears that the ALJ viewed such activities in isolation and failed to evaluate Plaintiff's statements and testimony as a whole. For

example, in support of his finding that Plaintiff is generally comfortable being around people and gets along with people in his community, the ALJ cites to the report of Dr. Schulz, a psychologist who examined Plaintiff in November 2006.  Notably, under "Legal History," Dr. Schulz states that Plaintiff was arrested in 2000 and 2005, but that Plaintiff also reported that he gets along with people and is comfortable around people. (Tr. 217).  However, Dr. Schulz' report also indicates that Plaintiff was a loner in school, has been fired from jobs because he is unable to get along with his boss and co-workers, does not attend any community events or activities.  The ALJ also failed to note that Dr. Schulz found Plaintiff's ability to relate to others to be moderately to severely impaired.  (Tr. 221).

Next, at the administrative hearing, the ALJ specifically asked Plaintiff if he used illegal drugs and where he acquired them.  (Tr. 53).  Plaintiff responded that he used drugs "at times" and further testified that he would get them "off the street."  (Tr. 54). Plaintiff stated that he lives a small town and knew everyone, and if he took a walk "uptown" we would see everyone in town and people hanging out would say "Hey, I got this, I got that, you know."  (Tr. 54).  However, Plaintiff also testified that that he does "pretty much nothing" all day and is "in front of  -- on the couch in front of a TV screen." (Tr. 59).  Plaintiff further testified that he has serious issues with anger resulting in outbursts three or four times a day which includes yelling and screaming and hitting things.

Thus, the ALJ's determination that Dr. Oberlander was entitled to little weight in light of Plaintiff's activities ignores the objective findings[4] of record.  Despite the ALJ's

---

[4] Objective medical evidence consists of medical signs and laboratory findings as defined in 20 C.F.R. §

findings, the record contains substantial objective evidence relating to Plaintiff's mental impairments. These include clinical findings such as racing thoughts, loose thought process, angry effect, crying spells, rapid speech, hyper-verbal, hyperactive, irritable, poor concentration, elated mood, manic episodes, pressured speech and labile effect (Tr. 210-211, 246-305, 309-10, 321, 327, 376, 405, 407, 414, ). Moreover, to the extent the ALJ found Plaintiff's GAF score to support his paragraph B analysis, the Sixth Circuit has repeatedly stated that GAF scores are not medical data; rather they are subjective determinations, and ALJs are not required to rely on them in making disability determinations. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir.2002). *See also Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir.2007); *Kornecky v. Comm'r of Soc. Sec.*, No 04–2171, 2006 WL 305648, at *13–14 (6th Cir. Feb.9, 2006).

Furthermore, Plaintiff's ability to perform limited activities such as bowling, playing music and maintain a relationship with a girlfriend is not substantial evidence that his symptoms are not disabling. *See* 20 C.F.R. § 404.1572(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity."); *Rogers v. Comm'r of Soc. Sec*, 486 F.3d 234, 248–49 (6th Cir. 2007) (the minimal daily functions of driving, cleaning an apartment, caring for pets, laundry, reading, exercising and watching the news are not comparable to typical work activities); *Cohen v. Sec'y Dept. Health & Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992) (the fact that disability

---

404.1528(b) and (c). See 20 C.F.R. § 404.1512(b)(1). "Signs" are defined as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b).

claimant continued ballroom dancing and attended law school during period for which she claimed disability benefits did not warrant a finding that she could maintain substantial gainful employment).

Based on the foregoing, the undersigned finds that the ALJ improperly evaluated the evidence relating to the paragraph B criteria in determining that Plaintiff did not meet or equal any of the Listing related to mental impairments. Accordingly, the ALJ's determination that Plaintiff's impairments did not meet or equal Listings 12.02, 12.04, 12.06, 12.08 and/or 12.09 cannot be sustained and further fact-finding is necessary

### III. Conclusion and Recommendation

This matter should be remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. A sentence four remand under 42 U.S.C. §405(g) provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions and further fact-finding is necessary. *See Faucher v. Secretary of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted). In a sentence four remand, the Court makes a final judgment on the Commissioner's decision and "may order the Secretary to consider additional evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher*, 17 F.3d at 175. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish Plaintiff's entitlement to benefits as of his alleged onset date*. Id.* 17 F.3d at 176.

For the reasons explained herein, **IT IS RECOMMENDED THAT**:

1.    The decision of the Commissioner to deny Plaintiff DIB benefits be **REVERSED** and this matter be **REMANDED** under sentence four of 42 U.S.C. §405(g).

2.    On remand, the ALJ be instructed to: 1) properly assess and evaluate the opinion evidence, and provide a clear explanation for the conclusions reached; and 2) reevaluate whether Plaintiff's impairments meet or equal listings 12.02, 12.04, 12.06, 12.08 and/or 12.09

3.    As no further matters remain pending for the Court's review, this case be **CLOSED**.

  _/s Stephanie K. Bowman_
  Stephanie K. Bowman
  United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JONATHON R. WYATT,                                    Case No. 1:12-cv-289

       Plaintiff,                                    Beckwith, J.
                                                                  Bowman, M.J.

   v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

22